FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDER GIAP,<br><br>Defendant,<br><br>ITRADE LLC,<br><br>Relief Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

2012 FEB 23 P 2: 55

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

Case No

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND PENALTIES UNDER THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§ 1 - 25**

1: 12 cv 193 CMH/TCB

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

### I.     SUMMARY

1.      From January 2009 through at least September 2009, and from October 2009 through at least October 2011, Alexander Giap ("Giap" or "Defendant"), a convicted felon, operated two separate fraudulent schemes involving commodity futures trading.  In the January 2009 through at least September 2009 scheme, Giap acted as an unregistered commodity trading advisor ("CTA") and used iTRADE LLC ("iTRADE") to solicit funds for his CTA business.  In the October 2009 through October 2011 scheme, Giap acted as an unregistered CTA but did not incorporate iTRADE into his operations.  In both schemes, Giap defrauded clients through a series of material omissions which resulted in substantial financial losses to the clients.

2.      From January 2009 through at least September 2009, Giap fraudulently solicited and accepted at least $104,000 from 13 or more individuals to participate in

iTRADE, a "school" Giap used to conduct his CTA business. He referred to these clients as "students."

3.      Throughout this period, in order to induce client participation in the iTRADE scheme, Giap, acting as an unregistered CTA, omitted material facts to actual and prospective clients. These material omissions included failing to inform potential and actual clients: of the full extent of his history of substantial losses trading commodity futures, that he was a convicted felon, that he had taken no steps to ensure that he could honor his money back guarantee, and that he had no means to repay funds as he had promised.

4.      In addition to the scheme involving iTRADE, during the period from October 2009 through October 2011, Giap acted as an unregistered CTA when he advised at least four (4) individuals regarding the value or advisability of trading in futures contracts directly through managed accounts in exchange for compensation or profit.

5.      In order to induce client participation in his CTA business, Giap omitted material facts when he solicited members of the general public to purchase his commodity trading advice and services. These omissions included failing to disclose that he was a convicted felon, failing to disclose the full extent of his history of substantial losses trading commodity futures, and failing to disclose that he was required to register as a CTA but had not done so. During this time period, Giap fraudulently solicited over $700,000 for trading.

6.      Giap used relief defendant iTRADE to solicit funds for his commodity trading advisory service. He established banking and trading accounts in iTRADE's name. iTRADE is named as a relief defendant; it is not charged with violations of the

2

Act. However, it received funds from Giap in which it had no legitimate interest or entitlement and which were derived from Giap's fraudulent acts. iTRADE, therefore, must return and repay these funds.

7.      Through his ongoing conduct, Giap has engaged, is engaged, or is about to engage in acts and practices in violation of the anti-fraud provisions of Section 4o(1)(A) and (B) of the Commodity Exchange Act , 7 U.S.C. § 6o(1)(A) & (B) (2006), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), § 13102, 122 Stat. 1651 (enacted June 18, 2008), and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 1 et seq., and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 et seq. (2011).

8.      By soliciting clients through his tax business, Giap used the means and instrumentalities of interstate commerce in conducting his business as a CTA without being registered as such in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

9.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), the Commission brings this action to enjoin Giap's unlawful acts and practices and to compel his compliance with the Act. In addition, the Commission seeks civil monetary penalties and equitable relief, including restitution, disgorgement of Giap's ill-gotten gains, a permanent trading ban, and such other relief as the Court may deem necessary or appropriate.

10. Unless permanently restrained and enjoined by the Court, Giap is likely to continue to engage in the illegal acts and practices alleged in this Complaint, as more fully described below.

## II.    JURISDICTION AND VENUE

11. The Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order there under.

12. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that Defendant is found in, inhabits, or transacts business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

## III.    PARTIES

**Plaintiff**

13. **Plaintiff U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act.

**Defendant**

14. **Defendant Alexander Giap** resides in Annandale, Virginia, and operated an unregistered commodity trading advisory service. Giap never registered with the Commission in any capacity, nor has he sought or does he qualify for exemption from registration.

4

**Relief Defendant**

15.     **iTRADE LLC** was a Virginia limited liability corporation that operated

out of Falls Church, Virginia.  The State Corporation Commission of the Commonwealth

of Virginia corporate database lists Anh Tran ("Tran") as the "Member/Manager."  Giap

is not listed.  Nonetheless, Giap used iTRADE to help him solicit CTA clients.  iTRADE

never registered with the Commission in any capacity.

## IV.   FACTS

16.     Giap is a convicted felon.  In 1995, he pled guilty to bid rigging, wire

fraud and bank fraud for his involvement in three separate criminal schemes that involved

the buying, selling and loan refinancing of residential real estate in northern Virginia

during the period 1991 until May 1995.

17.     Giap still owes restitution relating to his criminal conviction.

18.     Giap is also the subject of Internal Revenue Service liens for delinquent

taxes related to his residential real estate schemes.

19.     In order to avoid seizure by the Internal Revenue Service, Giap

intentionally holds no bank accounts or assets in his own name.

**A.    The iTRADE Unregistered Commodity Trading Advisory Service**

20.     Giap formed iTRADE as a Virginia limited liability corporation in July

2007.  Giap named Tran, his girlfriend, the president, managing member, and, initially,

the sole shareholder of iTRADE.

21.     At its inception, Giap used iTRADE as a "school" to teach other

individuals how to trade equities and options on equities.  However, from January 2009

through at least September 2009, Giap used iTRADE to solicit for his commodity trading advisory services and turned the iTRADE "students" into clients.

22.     Section 1a(6) of the Act, 7 U.S.C. § 1a (6) (2006), defines a CTA as a person who advises another about the value or advisability of trading in futures contracts, either directly or through publications, writings or electronic media, for compensation or profit.

23.     From January 2009 to June 2009, Giap opened at least nineteen (19) accounts at registered futures commission merchants ("FCMs"). The accounts were opened under the names of iTRADE and Tran at FCMs known as Trade Station, MB Trading, MF Global and Rosenthal Collins. Additional accounts were opened by Giap for Tran, iTRADE, and Tran's parents (Len Vu and Thuy Tran) at a FCM known as Trans Act Futures.

24.     Giap solicited commodity trading advisory clients through his iTRADE "school" from members of the public, primarily clients from his tax preparation business.

25.     Clients provided between $4,000 to $20,000 to Giap to join the iTRADE "school." Giap deposited the funds in iTRADE and Tran bank accounts. He then transferred the funds from the bank accounts to accounts with FCMs in iTRADE's, Tran's, and Tran's parents' names. The "students" traded the money in the accounts at the FCMs in iTRADE's, Tran's, and Tran's parents' names.

26.     Giap completed the trading account applications held in iTRADE, Tran, and Tran's parents' names and, in some instances, digitally signed account opening documents for them without giving them a chance to review and/or verify the information.

6

27.    All of the account applications contained false statements regarding the applicant's trading experience.  They claimed that Tran or her parents' held between two- and four-years' experience trading commodity futures when Tran and her parents had little or no experience trading commodity futures.

28.    Many of the account opening documents falsely indicated that the account holder was the sole source of funds deposited in the account.  In fact, the commodity futures accounts were funded with Tran's life savings, iTRADE "students'" "tuition," and through personal loans obtained by Giap.

29.    Throughout the time Giap operated iTRADE as a commodity trading advisory service, he did not register with the Commission as a CTA nor did he seek exemption from registration.

30.    During a 10 to 12 month "class" period, clients were given access to trading accounts held by iTRADE, Tran or Tran's parents and traded at Giap's direction. During this period, at least 13 individuals participated in Giap's iTRADE commodity trading advisory business.

31.    Giap directed every aspect of these clients' trading – telling them which futures  contracts to buy or sell, the number of contracts to buy or sell, the price, and when to do so.  He acted as a puppet master: using clients on multiple computers to execute trades he directed.  For each client, Giap agreed to split equally the profits from the trades executed by the respective clients at Giap's direction.

32.    Clients who failed to follow Giap's directions exactly were penalized and forced to repay any losses resulting from unauthorized transactions.

33.     Giap acted as the CTA of the iTRADE commodity trading advisory service. As a CTA, Giap owed a fiduciary duty to disclose all material information to his clients, the iTRADE "students." Failure to provide this information is a material and fraudulent omission. Giap solicited clients through instrumentalities of interstate commerce, including telephone lines, and received funds from such individuals through instrumentalities of interstate commerce.

34.     At a minimum, Giap omitted the following material information from his clients:

        a.  he failed to disclose that he was a convicted felon;

        b.  he failed to disclose that he owed restitution relating to his criminal conviction;

        c.  he failed to disclose that he was subject to Internal Revenue Service liens for delinquent taxes;

        d.  he failed to disclose the full extent of his history of losses incurred trading commodity futures. Giap's trading resulted in substantial losses, losing money seven out of the nine months from January 2009 through September 2009, or 77% of the time. Over this same time period, he traded eighteen (18) of nineteen (19) accounts to a net loss. He had a total loss of $92,807.06; and

        e.  he failed to disclose that he was required to register as a CTA but failed to do so.

35.     In addition to his omissions, Giap made fraudulent statements to actual and prospective clients. In his solicitations and agreements with students, Giap

fraudulently indicated that the clients' funds were not at risk because he provided a "money back guarantee."

36.     The "money back guarantee" offered by Giap provided that if clients continued trading for a period of 10 to 12 months, the client could receive profits up to, or greater than, their initial deposit or Giap would personally repay the difference between profits earned by the client and the initial deposit. Thus, according to Giap, clients could only make money and could not lose their initial deposit. Money back guarantees based upon the trading of futures contracts are misleading given the inherent risks of trading such instruments.

37.     Moreover, Giap's money back guarantee was a ruse for at least two reasons. First, because of his felony conviction, Giap intentionally held no personal assets or means by which to fulfill the money back guarantee as promised. Any assets owned or acquired by him were subject to government liens, which may be given priority over the later acquired obligations of iTRADE clients. Giap failed to disclose the fact that he held no personal assets or means by which to fulfill the money back guarantee. He also failed to disclose the fact that any assets he owned or acquired were subject to liens which may be given priority over iTRADE clients.

38.     Second, the only method by which Giap could fulfill his obligations under the money back guarantee was to trade successfully. However, if Giap was a successful trader the participants would share in the profits and Giap would have no obligations under the money back guarantee. In essence, he offered a guarantee that he would only be capable of honoring when he had no obligation to honor it. Giap has failed to repay the deposits made. He owes at least $104,282 in principal to iTRADE clients.

9

**B.** **Giap's Second Unregistered Commodity Trading Advisory Business**

39.     As discussed above, section 1a(6) of the Act, 7 U.S.C. § 1a (6) (2006),

defines a CTA as a person who advises another about the value or advisability of trading

in futures contracts, either directly or through publications, writings or electronic media,

for compensation or profit.

40.     Some of the individuals approached by Giap to join the iTRADE "school"

were unable or unwilling to devote the time necessary to attend his "classes." Instead, he

solicited them for another advisory services scheme. The services Giap offered included

opening commodity futures trading accounts which he would personally manage for a

fee. Profits generated by Giap's trading were to be split equally between Giap and the

client. By providing these services, Giap acted as a CTA. As a CTA, Giap owed a

fiduciary duty to disclose all material information to his clients. Failure to provide this

information is a material and fraudulent omission. He acted as a CTA in this capacity

from October 2009 through October 2011.

41.     Giap solicited advisory clients through instrumentalities of interstate

commerce, including telephone lines, and used instrumentalities of interstate commerce

when he executed trades via interstate wires and telephone lines on the Chicago

Mercantile Exchange's Globex trading platform.

42.     Giap assisted an individual in creating a Virginia limited liability

corporation ("Individual Number One") and then opened an account for that corporation

with the FCM known as TransAct Futures. After Individual Number One deposited

funds into the account, Giap began trading the account and initially generated profits.

Giap was paid $14,985.35 for his CTA services on December 23, 2009. After that,

trading declined and overall Giap generated losses of $123,330 after fees and commissions for the corporation's account.

43.     Giap also assisted another individual, "Individual Number Two," in opening an account at TransAct Futures and began trading the account after that person deposited funds. Giap's trading generated losses of $69,790 for that individual's account.

44.     On or about January 7, 2010, Giap's trading in Individual Number One's and Two's accounts resulted in a margin calls of $2,336,567.30 and $2,653,161.50, respectively. TransAct Futures and ultimately, the National Futures Association, conducted an inquiry and learned that Individual Number One and Two had given Giap access to their accounts by providing their usernames and passwords without completing power of attorney forms as required by TransAct Futures.

45.     Individual Number One and Two were able to offset their positions before meeting the margin call and immediately closed their accounts.

46.     Around this time, Individual Number Two, who had used Giap's tax preparation services, was audited by the IRS. During the course of the audit he learned that Giap was a convicted felon. He alerted Individual Number One of Giap's status as a convicted felon and both ceased all business dealings with Giap.

47.     Giap provided similar services for a third person, "Individual Number Three," by assisting him in opening a commodity futures trading account at TransAct Futures and managing his account in exchange for a fifty percent share of all profits generated by Giap's trading.

48.     Giap provided trading services for a fourth person, "Individual Number Four," through that person's accounts. Individual Number Four had a total of four

11

accounts. Those accounts were held at AMP Global Clearing, LLC, Crossland, LLC, Open E Cry, LLC, and Vision Financial Markets. Giap managed the accounts in return for a fifty percent share of all profits generated by Giap's trading.

49.     Like Individual Number One and Individual Number Two, Individual Number Three and Individual Number Four allowed Giap access to their accounts so that Giap could trade them without completing the power of attorney forms identifying Giap as the trader of those accounts.

50.     Giap's trading generated losses in Individual Number Three's account of $104,132.50. He generated losses in Individual Number Four's accounts of $41,413.37.

51.     The non-iTRADE CTA scheme ran from October 2009 through at least October 2011. Giap had a net loss in all seven (7) of the trading accounts open during this time period. Calculated on a monthly basis, Giap lost money thirteen (13) out of twenty-five (25) months. In other words, Giap suffered a loss 52% of the time when calculated on a monthly basis.

52.     Throughout the entire period when Giap provided advice and made trading decisions for these seven accounts, he did not register with the Commission as a CTA, nor did he seek or qualify for exemption from registration.

53.     At a minimum, Giap also omitted the following material information as a CTA:

   a.     he failed to disclose that he was a convicted felon;

   b.     he failed to disclose the full extent of his history of losses incurred trading commodity futures, which includes failing to disclose the losses he incurred trading commodity futures through iTRADE; and

    c.      he failed to disclose that he was required to register as a CTA but failed to do so.

## V.    VIOLATIONS OF THE ACT

54.    Giap's actions violated the anti-fraud and registration requirements of the Act.

### COUNT ONE

### Fraud By a Commodity Trading Advisor
### (Violation of Section 4$\underline{o}$(1)(A) & (B) of the Act, 7 U.S.C. § 6$\underline{o}$(1)(A) & (B) (2006))

55.    Paragraphs 1 through 54 are re-alleged and incorporated herein.

56.    As alleged above, during the relevant period, Giap acted as a CTA by advising others regarding the value or advisability of trading in futures contracts, either directly or through publications, or writings or electronic media, for compensation or profit.

57.    As alleged above, during the relevant period, while acting as a CTA, Giap, through the means or instrumentalities of interstate commerce, employed a device, scheme or artifice to defraud his CTA clients and engaged in a transaction, practice or course of business that operated as a fraud or deceit upon his CTA clients and prospective clients. This included, but was not limited to, (1) failing to disclose that he was a convicted felon; (2) failing to disclose that he owes restitution relating to his criminal conviction; (3) failing to disclose that he is subject to Internal Revenue Service liens for delinquent taxes; (4) failing to disclose the full extent of his history of large losses on a regular basis in commodity futures trading; and (5) failing to disclose that he was required to register as a CTA but failed to do so. Consequently, he violated Section 4$\underline{o}$(1)(A) & (B) of the Act, 7 U.S.C. § 6$\underline{o}$(1)(A) & (B) (2006).

13

58.     Each misrepresentation or omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1)(A) & (B) of the Act, 7 U.S.C. § 6o(1)(A) & (B) (2006).

## COUNT TWO

### Failure to Register As a Commodity Trading Advisor
### (Violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006))

59.     Paragraphs 1 through 54 are re-alleged and incorporated herein.

60.     As alleged, during the relevant period, Giap acted as a CTA within the meaning of Section 1a(6) of the Act, 7 U.S.C. § 1a(6) (2006), while failing to register as a CTA in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

## COUNT THREE

### Relief Defendant Must Disgorge Funds To Which It Is Not Entitled

61.     Paragraphs 1 through 55 are re-alleged and incorporated herein.

62.     Relief Defendant iTRADE received funds as a result of Giap's fraudulent conduct, and has been unjustly enriched thereby.

63.     iTRADE has no legitimate entitlement to or interest in the funds received as a result of Giap's fraudulent conduct and/or misappropriation.

64.     iTRADE should be required to disgorge funds up to the amount it received from Giap's fraudulent conduct and misappropriation, or the value of those funds that they may have subsequently transferred to third parties.

## VI.   RELIEF

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers, enter:

(a) an order finding that Defendant violated: Section 4o(1)(A) &(B) of the Act, 7 U.S.C. § 6o(1)(A) & (B) (2006); and Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006);

(b) an order of permanent injunction prohibiting Defendant, and any other person or entity associated with him, including any successor thereof, from engaging in conduct violative of the sections of the Act that the Defendant has been alleged to have violated;

(c) an order of permanent injunction prohibiting Defendant from engaging, directly or indirectly, in

1. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act as amended by the CRA and the Dodd-Frank Act, to be codified at 7 U.S.C. § 1a);

2. Entering into any transactions involving commodity futures, options on commodity futures, commodity options as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2011), security futures products, and/or foreign currency (as described in Section 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(B) and 2(c)(2)(C)(i)) (forex contracts) for his own personal account or for any account in which he has a direct or indirect interest;

3. Having any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts traded on his behalf;

4. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

15

5.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

6.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and

7.      Acting as a principal (as that term is defined in Regulation 3.1(a)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011).

(d) an order directing Defendant, as well as any other person or entity associated with him, including any successor thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act, as described herein, and interest thereof from the date of such violations;

(e) an order directing Defendant, as well as any other person or entity associated with him, including any successor thereof, to make full restitution, pursuant to such procedure as the Court may order, to every CTA client whose funds were traded by him as a result of acts and practices which constitute violations of the Act, as described herein, and interest thereon from the date of such violations;

(f) an order requiring Defendant to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of (1) triple the

16

monetary gain to Defendant for each violation of the Act or (2) $140,000 for each

violation of the Act on or after October 23, 2008; and

   (g) an order for such other and further remedial ancillary relief as the Court may

deem appropriate.


Respectfully submitted this 23rd day of February, 2012.


        **U.S. COMMODITY FUTURES TRADING**
        **COMMISSION**

        Allison Baker Shealy (VA 46634; DC 478202)
        U.S. Commodity Futures Trading Commission
        Division of Enforcement
        1155 21st Street, N.W.
        Washington, D.C. 20581
        (202) 418-5000
        ashealy@cftc.gov